UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
_____

NO. 2014-7094
_____
_____

JAMES S. MCKINNEY

Claimant-Appellant

v.

ROBERT A. MACDONALD, SECRETARY OF VETERANS AFFAIRS

Respondent - Appellee
_____

APPEAL FROM THE UNITED STATES COURT OF APPEALS FOR
VETERANS CLAIMS IN 12-2790, JUDGE CORAL W. PIETSCH PRESIDING
_____

ORIGINAL BRIEF OF APPELLANT JAMES .S. MCKINNEY
_____

ATTORNEY FOR APPELLANT
John B. Wells
Attorney for Appellant
LA Bar #23970
P. O. Box 5235
Slidell, LA 70469-5235
769 Robert Blvd, Suite 201D
Slidell, LA 70458
985-641-1855
985-649-1536 (fax)
JohnLawEsq@msn.com

## **CERTIFICATE OF INTEREST**

NOW COMES BEFORE this Honorable Court, pursuant to Rule 47.6, attorney for appellant, James S. McKinney, John B. Wells Esquire, to file the required certificate of interest providing herein:

The represented party in this case is James S. McKinney.

The real party in interest is James S. McKinney.

The corporate disclosure statement require by Rule 26.1 does not apply.

The appellant will be represented by the Law Office of John B. Wells, 769 Robert Blvd., Suite 201D, Slidell, LA 70458.

There are no corporations involved in this appeal.


//s// John B. Wells
John B. Wells

i

# TABLE OF CONTENTS

Certificate of Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Statement of Related Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Statement of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Statement of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      The Court Below Erred in Not Finding Clear and Unmistakable Error
        because the Veterans Law Judge Improperly Applied the Law In Effect at
        the Time of the Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        A.      The Paternal VA System Required the Application of the M-21-1MR
                Manual Revision Even if the New Revision Was Effective After the
                Date of the Original Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
                1.      The VA Adjudication System is designed by Congress
                        to favor the veteran in a paternal matter and to be non-
                        adversarial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
                2.      The VA exceeded its authority in adopting 38 C.F.R. §
                        20.1403(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                3.      The adoption of the new M21-1MR Manual should
                        have been retroactive. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        B.      The Law Prior to the M21-1MR Manual Required the Presumption to
                Be Granted for Entry into Da Nang Harbor. . . . . . . . . . . . . . . . . . 15

    C.    The Change in the Law Reflected By the M21-1MR Manual Required the Board to Order the Restoration of Benefits under *Nehmer*. . . . . . 17

II.    The Refusal of the VA and the Court Below to Find that the Veteran Was Presumptively Exposed to Agent Orange Was Clear and Unmistakable Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.    *Haas v. Peake* Does Not Control in this Matter. . . . . . . . . . . . . . . 20

    B.    The Failure to Grant Service Connection Based on the Ship's Anchorage in Nha Trang Was Clear and Unmistakable Error. . . . . . 22

    C.    The Failure to Find that Service in Territorial Seas Constitutes Service in the Republic of Vietnam Was Clear and Unmistakable Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III.    The Instant Case Meets the Criteria for Clear and Unmistakable Error Because the Veterans Law Judge Required the Veteran to Show a Ship's Log Entry When He Proceeded Ashore When No Such Entry was Required. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant submits that oral argument may be of some assistance to the court in applying the unique veterans laws and standards of review to the facts of this case. Additionally, there are various aspects of naval engineering, navigation and international law which are germane to this case. Counsel for the Appellant is a retired Navy Commander qualified in all aspects of shipboard operations up to and including command at sea. Oral argument may assist the court in exploring these matters and counsel will be able to clarify any technical issues raised in the briefs.

# TABLE OF AUTHORITIES

**Cases**:

*Alaska v. United States.* 545 U.S. 75, 125 S.Ct. 2137 (2005). . . . . . . . . . . . . . . . 33

*Bingham v. Nicholson* 421 F.3d 1346, 1348 ( Fed. Cir. 2005). . . . . . . . . . . . . . . 6

*Blue Water Navy Vietnam Veterans Association v. McDonald*, U. S. D. C. (Dist. DC)1:13-cv-1187-TSC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Boumediene v. Bush,* 553 U.S. 723, 832, 128 S.Ct. 2229, 2296 (2008). . . . . . . . . 33

*Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 213 (1988). . . . . . . . . . . . . 21

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*Christopher v. Smith Kline Beecham Corp.*, 132 S.Ct. 2156 (2012). . . . . . . . 21, 22

*Coffy v. Republic Steel Corp.,* 447 U.S. 191, 196, 100 S.Ct. 2100 (1980). . . . . . . . 8

*Comer v. Peake,* 552 F.3d 1362, 1368 (Fed.Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 9

*Farce v. Principi*, 284 F.3d 1335, 1360 (Fed.Cir. 2002) . . . . . . . . . . . . . . . . . . . . 9

*Fishgold v. Sullivan Drydock & Repair Corp.,* 328 U.S. 275 (1946). . . . . . . . . . . 8

*Gambill v. Shinseki*, 576 F.3d 1307, 1314 (Fed. Cir.2009). . . . . . . . . . . . . . . . . 7, 9

*Haas v. Peake,* 525 F.3d 1168, 1196 (Fed. Cir. 2008). . . . . . . . iii, 14, 20, 21, 22, 31

*Haas v Peake*, 544 F.3d 1306, 1309 (Fed. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . 20

*Haas v. Shinseki*, 22 Vet. App. 385 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Henderson ex rel. Henderson v. Shinseki* 131 S.Ct. 1197, 1206 (2011). . . . . . . 8, 21

*Hodge v. West,* 155 F.3d 1356, 1362 (Fed.Cir.1998). . . . . . . . . . . . . . . . . . . . . . 9

*Jaquay v. Principi,* 304 F.3d 1276, 1282 (Fed.Cir.2002). . . . . . . . . . . . . . . . . . . . 9

*Jordan v. Nicholson* 401 F.3d 1296, 1298 -1299 (Fed. Cir. 2005). . . . . . . . . . . . . 13

*King v. St. Vincent's Hospital,* 502 U.S. 215, 112 S.Ct. 570, (1991). . . . . . . . . . . 8

*Louisiana v. Mississippi,* 202 U.S. 1, 52 (1906). . . . . . . . . . . . . . . . . . . . . . . . 31

*Masters v. United States.,* 229 F.2d 677 (6th Cir. 1956). . . . . . . . . . . . . . . . . . . 11

*Mayfield v. Nicholson* 499 F.3d 1317, 1322 (Fed. Cir. 2007). . . . . . . . . . . . . . . . 6

*McGee v. Peake,* 511 F.3d 1352, 1357 (Fed.Cir. 2008). . . . . . . . . . . . . . . . . . . . 9

*Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs,* 260 F.3d 1365
(Fed.Cir.2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Nehmer v. U.S. Veterans' Admin.,* 712 F.Supp. 1404
(N.D.Cal.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii, 4, 7, 18, 19,20

*Nehmer v. Veterans' Admin. of Government of U.S.,* 284 F.3d 1158
(9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 18

*Paralyzed Veterans of Am. v. West,* 138 F.3d 1434, 1436 (Fed.Cir.1998). . . . . . . 15

*Patrick v. Shinseki,* 668 F.3d 1325, 1329 (Fed. Cir. 2011). . . . . . . . . . . . . . . 13, 15

*Prenzler v. Derwinski,* 928 F.2d 392, 393 (Fed.Cir.1991). . . . . . . . . . . . . . . . . . 6

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835
(1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Smith v. Brown,* 35 F.3d 1516, 1523 (Fed.Cir. 1994). . . . . . . . . . . . . . . . . . . . . 20

*Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 114 S.Ct. 2381 (1994). . . . . . . 21

*Tropf v. Nicholson*, 20 Vet.App. 317 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Alaska* 521 U.S. 1, 62 (1997). . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Louisiana*, 394 U.S. 11 (1969). . . . . . . . . . . . . . . . . . . . . . . . 32

*United States. v. Maine*, 475 U.S. 89, 94, 106 S.Ct. 951, 954 (1986). . . . . . . . . 33

*United States v. State of California*, 381 U.S. 139 (1965). . . . . . . . . . . . . . 16, 33

*Walters v. National Assn. of Radiation Survivors*, 473 U.S. 305, 105 S.Ct. 3180 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Willsey v. Peake*, 535 F.3d 1368, 1371 (Fed. Cir. 2008). . . . . . . . . . . . . . . . . . 13

*White v. Principi* 243 F.3d 1378, 1381 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . 7

*Wynn v. Gober* 17 Vet.App. 460 (Vet.App. 2000). . . . . . . . . . . . . . . . . . . . . . 22

**Statutes:**

38 U.S.C. § 501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

38 U.S.C. § 1113. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

38 U.S.C. § 1116. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 21

38 U.S.C. § 7104. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

38 U.S.C. § 7111. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

38 U.S.C. § 7252. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

38 U.S.C. § 7292. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii, 5

**Code of Federal Regulations:**

38 C.F.R. § 3.303. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

38 C.F.R. § 3.816. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19

38 C.F.R. § 20.1403(e). . . . . . . . . . . . . . . . . . . . . . . . . . ii, 4, 6, 7, 10, 12, 13

72 Fed.Reg. 66,218, 66,219 (Nov. 27, 2007). . . . . . . . . . . . . . . . . . . . . . . 15

**Other Authorities:**
Agreement on the Cessation of Hostilities in Vietnam, July 20, 1954. . . . . . . 27, 29

Agreement On Ending The War And Restoring Peace In Viet-Nam, executed and
entered into force on January 27, 1973. . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Blue Water Navy Vietnam Veterans and Agent Orange Exposure*, National
Academies Press (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Board of Veterans Appeals docket number 04-00-250. . . . . . . . . . . . . . . . . . 14

*Cancer Incidence in Vietnam Veterans* 2005. . . . . . . . . . . . . . . . . . . . . . . . 21

Convention on the Territorial Sea and Contiguous Zone, [1958] 15 U.S.T. 1607,
T.I.A.S. No. 5639. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20, 28, 32, 34

Federal Rule of Appellate Procedure 32. . . . . . . . . . . . . . . . . . . . . . . . . . . 37

HR 543. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

HR 4435. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*The Joint Chiefs of Staff and the War in Vietnam 1960-1968,*. . . . . . . . . . . . . 30

M21-1 Manual. . . . . . . . . . . . . . . . . . . ii, iii, 2, 4, 6, 7, 10,13, 14, 15, 17, 19, 20

National Research Centre for Environmental Toxicology and the Queensland
Health Services, EXAMINATION OF THE POTENTIAL EXPOSURE OF ROYAL
AUSTRALIAN NAVY (RAN) PERSONNEL TO POLYCHLORINATED DIBENZODIOXINS
AND POLYCHLORINATED DIBENZOFURANS VIA DRINKING WATER, Brisbane
Queensland, Australia (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

OPNAVINST 3100.7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Pavlov, et, al*, *Present-Day State of Coral Reefs of Nha Trang Bay (Southern Vietnam) and Possible Reasons for the Disturbance of Habitats of Scleractinian Corals*, Russian Journal of Marine Biology, Vol. 30, No. 1 (2004). . . . . . . . . . . . . 24

J.P. Rossie et. al., The Da Nang Harbor Report, www.BlueWaterNavy.org (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Report of the Seventh Biennial Committee *Veterans and Agent Orange* of the Institute of Medicine (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

S 2410. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United Nations Convention on the Law of the Sea. . . . . . . . . . . . . . . . . . . . 28, 32

United States Department of State *Bureau* of *Intelligence and Research, Limits in the Seas No. 99* Straight Baselines: Vietnam, (1983). . . . . . . . . . . . . . . . . . . 16, 28

VAOPGCREC 7-93. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

.

## Statement of Related Cases

No appeal from the action below has been brought to this court prior to this action. The case of *Blue Water Navy Vietnam Veterans Association v. McDonald*, docket number 1:13-cv-1187-TSC, currently pending before the United States District Court for the District of Columbia includes some issues related to this case including issues concerning with the definition of inland or internal waters, the application of the territorial seas to the sovereign territory of the Republic of Vietnam and issues dealing with naval engineering. Additionally, HR 543, currently pending before the United States House of Representatives would clarify existing law by extending the presumption of Agent Orange exposure to the territorial seas of the Republic of Vietnam has 247 co-sponsors. A prerequisite to this bill, Section § 1090 of HR 4435, the National Defense Authorization Act of 2015, requiring the Secretary of Defense to plot the location of all ships deployed to Vietnam passed the House of Representatives on May 22, 2014. The Senate version of this provision, § 1062 is included in S 2410, currently pending before the Senate. Other cases concerning this matter are pending before the Board of Veterans Appeals.

## Statement of Jurisdiction

Jurisdiction rested in the court below under 38 U.S.C. § 7252 granting them

sole jurisdiction to review a decision of the Board of Veterans Appeals.  This

Court has jurisdiction over the matter pursuant to 38 U.S.C. § 7292(a) as a final

decision from the United States Court of Appeals for Veterans Claims.  A timely

notice of appeal was filed from that court's decision, denying Appellant's appeal

from the decision of the Board of Veterans Appeals.

### Statement of Issues

I.     The  Instant Case Meets the Criteria for Clear and Unmistakable Error
       because the Veterans Law Judge Improperly Applied the Law In Effect at
       the Time of the Hearing.

II.    The Refusal of the VA and the Court Below to Find that the Veteran Was
       Presumptively Exposed to Agent Orange Was Clear and Unmistakable
       Error.

III.   The Instant Case Meets the Criteria for Clear and Unmistakable Error
       Because the Veterans Law Judge Required the veteran to Show a Ship's
       Log Entry When He Proceeded Ashore When No Such Entry was Required.

**Statement of the Case**

James McKinney served in the United States Navy from July 1966 to 17 April 1970.  A 100.   He was assigned onboard *USS Pickaway* (APA 222),  an amphibious transport ship during the period October 1966 through February 1968.  A 185-86.  He was awarded the Vietnam Service Medal.  A 187.

During 1967, the *Pickaway* deployed to waters off the coast of the Republic of Vietnam and moored for several hours to Pier #3 in Da Nang, Vietnam on June 29, 1967.  A 79.  The ship also anchored in the harbor of Nha Trang for approximately 18 hours, A 80, as well as other harbors along the Vietnamese coast.  A 101-41.  *Pickaway* actually offloaded cargo at Da Nang. A 188.  The veteran has since been diagnosed with diabetes mellitus type 2.  A 78.

The current addition of the M21-1MR Manual, part IV, subpart ii, 2.C.10.k states that the presumption of exposure should be granted to a sailor if the ship was moored to a pier, the veteran was on the ship and the veteran stated that he left the ship.  The effective date of this Manual revision was July 20, 2009.

The instant claim for benefits was filed on August 19, 2004.  A 166.  The Chicago Regional Office denied the claim for benefits on March 29, 2005, because there was no evidence that the veteran had set foot in Vietnam.  A 167.  A statement of the case was issued on January 3, 2006.  A 95.  On January 17, 2006,

2

the substantive appeal was received at the Regional Office.  A 98.  A supplemental

statement of the case was issued on October 30, 2006.  A 96.  The BVA denied the

veteran's appeal on February 17, 2009.  A 71-82.

Appellant filed his Motion for Clear and Unmistakable Error (CUE) on May

31, 2011.  A. 56-63.  On March 29, 2012, the veteran, via counsel, waived the

reading of the claims file and provided supplemental information. A 45-54.  The

BVA denied the Motion for CUE on June 8, 2012.  A. 20-27.  The Veteran

appealed to the Court of Appeals for Veterans Claims.  Judge Pietsch acting for

that Court affirmed on February 20, 2014.  A 5-11.  On March 13, 2014, the

Appellant filed a Motion for Reconsideration by the Panel or for Full Court

Review in the Event the Panel Denies Reconsideration.  On April 21, 2014, a three

Judge panel granted the Motion for Reconsideration by the Panel but adopted the

original decision of the court.  A 12-13, 16.  The Motion for Full Court Review

was denied on May 21, 2014.  The Notice of Appeals was filed on June 3, 3014.

## Summary of the Argument

**It is undisputed that under current regulations the veteran is entitled to
the presumption of exposure to herbicides.  If the claim was filed today it
would have to be granted**.

The Board of Veterans Appeals erred in not granting the veteran's Motion

for Clear and Unmistakable Error (CUE). The decision turned on the BVA's belief that the M21-1MR provision relied upon by the veteran, adopted four months after the original decision, was not applicable because it was not retroactive. This position is contrary to the paternalistic non-adversarial adjudication process established by Congress and hyped by the VA. Additionally, it was based on a provision of the Code of Federal Regulations, 38 C.F.R. § 20.1403(e), which was *ultra vires*. Finally, the M21-1MR provision was interpretive rather than substantive and was therefore retroactive as a matter of law.

After finding *in camera* that the M21-1MR provision was enacted after the date of the veterans hearing, the BVA should have examined the law that was in effect at the time. This included BVA decisions which granted benefits to anyone entering Da Nang Harbor. The BVA should also have applied the *Nehmer* provisions as outline in 38 C.F.R. § 3.816 to provide the benefits retroactively.

Although raised before the BVA, neither the Veterans Law Judge or the court below addressed the veteran's direct exposure while anchored in Nha Trang Harbor. Nor did they address the domestic and international law arguments proving that the entrance into the internal bays and harbors, as well as the territorial seas, constitute service in the Republic of Vietnam within the scope of the original Agent Orange Act of 1991.

Based on the many arguments delineated herein, the Court should reverse the court below and remand for further proceedings.

## Argument

### Standard of Review

The limited standard of review for decisions of the Court of Appeals for Veterans Claims is outlined in 38 U.S.C. § 7292 and provides in pertinent part:

(a) After a decision of the United States Court of Appeals for Veterans Claims is entered in a case, any party to the case may obtain a review of the decision with respect to the validity of a decision of the Court on a rule of law or of any statute or regulation (other than a refusal to review the schedule of ratings for disabilities adopted under section 1155 of this title) or any interpretation thereof (other than a determination as to a factual matter) that was relied on by the Court in making the decision.

While not empowered to review factual determinations, this court has the authority to review decisions of the Court of Appeals for Veterans Claims and set aside any decision that this court finds to be:

[A] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
[B] contrary to constitutional right, power, privilege, or immunity;
[C] in excess of statutory jurisdiction, authority, or limitations, or in violation of a statutory right; or
[D] without observance of procedure required by law.

38 U.S.C. § 7292(d)(1).

In other words, legal determinations of the Veterans Court are reviewed

5

without deference. *Prenzler v. Derwinski,* 928 F.2d 392, 393 (Fed.Cir.1991). See, also, *Bingham v. Nicholson* 421 F.3d 1346, 1348 ( Fed. Cir. 2005). This Court cannot review purely factual determinations. *Mayfield v. Nicholson* 499 F.3d 1317, 1322 (Fed. Cir. 2007).

**I.      The Court Below Erred in Not Finding Clear and Unmistakable Error because the Veterans Law Judge Improperly Applied the Law In Effect at the Time of the Hearing**

As a threshold matter, the Board of Veterans Appeals decision seemed to turn on their assertion that the M21-1MR Manual was not in effect until four months after the original BVA decision. A. 23, 27. *See also*, Judge Pietsch's decision at 4. This decision was not based on statute but on 38 C.F.R. § 20.1403(e). No direct authority on the part of Congress can be found in support of this regulation and it is *ultra vires*.

Additionally, the BVA reviewed "change lists, Transmittal Sheets, and amendments to the M21-1MR Manual" to ascertain its effective date. A. 26. The effective date of the change was not clearly annotated in the Manual and not apparent to the veteran when he filed his Motion. Nor were the documents referred to by the Veterans Law Judge included in the record. The Veterans Law Judge impermissibly made his decision based on information found outside the record. The BVA like all administrative tribunals, must limit their review to matters of

record.  38 C.F.R. § 3.303, 38 U.S.C.A. § 7104(a), *White v. Principi* 243 F.3d 1378, 1381 (Fed. Cir. 2001).  Here the Appellant was not given an opportunity to review the changes.  Judge Pietsch notes in her opinion at 5 that he has not shown that such a review would "manifestly change the outcome."  Unfortunately, the BVA did not afford him that opportunity.

It is a basic tenant of due process that a petitioner has the right to notice and an opportunity to be heard.  *Gambill v. Shinseki*, 576 F.3d 1307, 1314 (Fed. Cir.2009).  Once the BVA reviewed the transmittal sheets and determined that the change in the M21-1MR Manual was not effective until June of 2009, the veteran should have been provided an opportunity to comment on the applicability of the change.  Had the BVA done so, the veteran would have provided the arguments delineated herein, especially that the paternal nature of the VA system coupled with the *ultra vies* enactment of 38 C.F.R. § 20.1403(e) and the normal construction of an interpretive regulation is retroactive, requiring that the presumption be granted. The veteran would also have produced evidence that the law in effect in February of 2009 was even more generous than the June 2009 change to the M21-1MR Manual and that irrespective of the state of the law at the time, the VA was required to grant benefits under *Nehmer v. U.S. Veterans' Admin.,* 712 F.Supp. 1404 (N.D.Cal.1989).  Since the veteran was denied the opportunity to raise these

7

issues at the BVA they must be raised here.  The issue was properly raised in the

court below.

    **A.**    **The Paternal VA System Required the Application of the M-21-1MR Manual Revision Even if the New Revision Was Effective After the Date of the Original Hearing**

        **1.**    <u>**The VA Adjudication System is designed by Congress to favor the veteran in a paternal matter and to be non-adversarial**</u>

Congress has designed the VA's adjudicatory process "to function

throughout with a high degree of informality and solicitude for the claimant."

*Walters v. National Assn. of Radiation Survivors*, 473 U.S. 305, 311, 105 S.Ct.

3180 (1985).  A unanimous[1] Supreme Court of the United States has upheld "the

canon that provisions for benefits to members of the Armed Services are to be

construed in the beneficiaries' favor." *Henderson ex rel. Henderson v. Shinseki* 131

S.Ct. 1197, 1206 (2011), *citing*, *King v. St. Vincent's Hospital,* 502 U.S. 215,

220–221, n. 9, 112 S.Ct. 570, (1991); *Coffy v. Republic Steel Corp.,* 447 U.S. 191,

196, 100 S.Ct. 2100 (1980); *Fishgold v. Sullivan Drydock & Repair Corp.,* 328

U.S. 275, 285, 66 S.Ct. 1105 (1946).

    The Federal Circuit has also recognized the paternalistic non-adversarial

intent of the system designed by Congress.  *Gambill v. Shinseki*, *supra*,  576 F.3d at

---

[1] Justice Alito wrote the opinion in which seven Justices joined.  Justice Kagan took no part in this case.

1317.    The *Gambill* court  described the process as follows:

> "[T]the character of the veterans' benefits statutes is strongly and
> uniquely pro-claimant." *Hodge v. West,* 155 F.3d 1356, 1362
> (Fed.Cir.1998) . The relationship between the veteran and the
> government is nonadversarial, *Jaquay v. Principi,* 304 F.3d 1276,
> 1282 (Fed.Cir.2002) (en banc), and because of the paternalistic nature
> of DVA proceedings, the DVA is required "to fully and
> sympathetically develop the veteran's claim to its optimum before
> deciding it on the merits," *Comer v. Peake,* 552 F.3d 1362, 1368
> (Fed.Cir. 2009); *McGee v. Peake,* 511 F.3d 1352, 1357 (Fed.Cir.
> 2008).  The process is "designed to function throughout with a high
> degree of informality and solicitude for the claimant." *Walters,* 473
> U.S. at 311, 105 S.Ct. 3180. Then-Chief Judge Mayer put the point
> succinctly when he stated, "Viewed in its entirety, the veterans'
> system is constructed as the antithesis of an adversarial, formalistic
> dispute resolving apparatus."  *Farce v. Principi*, 284 F.3d 1335, 1360
> (Fed.Cir. 2002) ( *en banc* ) (Mayer, C.J., dissenting).

*Id* at 1316.

While few practitioners of VA law actually believe that the Secretary

conducts disability adjudication proceedings in a paternalistic or non-adversarial

manner, that is the standard set by Congress and the courts and it should be

adhered to.  In the instant case, the summary disposition by the BVA, applying an

*ultra vires* regulation without allowing the veteran the opportunity to comment,

runs contrary to the paternalistic non-adversarial system envisioned by Congress.

It is undisputable that under existing regulations the veteran should be

granted the presumption of exposure to Agent Orange.   The fact that the veteran

has earned these benefits, even if, arguendo  the M21-1MR Manual was correctly

applied, makes the BVA's actions even more egregious.  This action is both

arbitrary and capricious and as discussed *infra*, unsupported by existing law.  In

light of the paternalistic non-adversarial adjudication process set in law and

ratified by the Courts, this matter should be remanded to the BVA for further

action to fully adjudicate the claim.

## 2. <u>The VA exceeded its authority in adopting 38 C.F.R. § 20.1403(e)</u>

In order to determine whether the VA had the authority to issue a regulation,

a court must undergo a two-step analysis pursuant to *Chevron U.S.A. Inc. v.*

*Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). This Court must

first determine "whether Congress has directly spoken to the precise question at

issue." *Id.* at 842.  However, if "Congress has not directly addressed the precise

question at issue," the Court must, determine whether the regulation is "based on a

permissible construction of the statute." *Id.* at 843.

The Secretary's power to promulgate regulations is codified in 38 U.S.C. §

501(a) which states:

> (a) The Secretary has authority to prescribe all rules and regulations
> which are necessary or appropriate to carry out the laws administered
> by the Department and are consistent with those laws, including--
> > (1) regulations with respect to the nature and extent of proof

and evidence and the method of taking and furnishing them in order to
establish the right to benefits under such laws;

      (2) the forms of application by claimants under such laws;

      (3) the methods of making investigations and medical examinations; and

      (4) the manner and form of adjudications and awards.

In order for a regulation to be valid, it must fall strictly within the narrow provision of 38 U.S.C. § 501(a). It should also be remembered that a regulation concerning benefits for veterans should be construed liberally. *Masters v. United States.*, 229 F.2d 677 (6th Cir. 1956).

The enabling statute for clear and unmistakable error (CUE) is found at 38 U.S.C. § 7111 which states as follows:

[a] A decision by the Board is subject to revision on the grounds of clear and unmistakable error. If evidence establishes the error, the prior decision shall be reversed or revised.
[b] For the purposes of authorizing benefits, a rating or other adjudicative decision of the Board that constitutes a reversal or revision of a prior decision of the Board on the grounds of clear and unmistakable error has the same effect as if the decision had been made on the date of the prior decision.
[c] Review to determine whether clear and unmistakable error exists in a case may be instituted by the Board on the Board's own motion or upon request of the claimant.
[d] A request for revision of a decision of the Board based on clear and unmistakable error may be made at any time after that decision is made.
[e] Such a request shall be submitted directly to the Board and shall be decided by the Board on the merits, without referral to any adjudicative or hearing official acting on behalf of the Secretary.
[f] A claim filed with the Secretary that requests reversal or revision

of a previous Board decision due to clear and unmistakable error shall
be considered to be a request to the Board under this section, and the
Secretary shall promptly transmit any such request to the Board for its
consideration under this section.

Conversely, 38 C.F.R. § 20.1403(e) reads as follows:

[e] Change in interpretation. Clear and unmistakable error does not
include the otherwise correct application of a statute or regulation
where, subsequent to the Board decision challenged, there has been a
change in the interpretation of the statute or regulation.

The authority for the regulation as cited therein is 38 U.S.C. §§ 501(a) and

7111. The first *Chevron* question is where in 38 U.S.C. § 7111, did Congress

grant the VA the authority to limit the effect or the retroactivity of CUE Motions.

The answer is nowhere. The Congress did not allow the VA to limit the

applicability of CUE. Thus the Court must analyze the second *Chevron* factor.

In order to be lawful, the regulation must meet the criteria listed in 38

U.S.C. § 501(a). The regulation did not govern the nature and extent of proof and

evidence or the method of taking and furnishing it in order to establish the right to

benefits under such laws as delineated in 38 U.S.C. § 501(a)(1). Nor did it

regulate the form of the application used by the claimant as required by 38 U.S.C.

§ 501(a)(2). The regulation does not provide guidance as to  the methods of

making investigations and medical examinations pursuant to 38 U.S.C. §

501(a)(3). Nor does it determine the manner and form of adjudications and

awards.  Instead it is an *ultra vires* usurpation of power on the part of the

Secretary.  Such an action is not only illegal, but goes against the paternalistic and

non-adversarial system envisioned by Congress.  In applying the canons of

construction of veterans statutes, this Court must find that the regulation

impermissibly burdens the veteran and must be set aside.

While Judge Pietsch did address this issue in light of *Willsey v. Peake*, 535

F.3d 1368, 1371 (Fed. Cir. 2008), neither *Willsey* or any other jurisprudence in this

Circuit requires the court below to apply a regulation that is *ultra vires*.

### 3.     The adoption of the new M21-1MR Manual should have been retroactive.

Absent the applicability of the *ultra vires* 38 C.F.R. § 20.1403(e), the new

version of the M21-1MR Manual should have been retroactive.  It is well settled

that while statutes are prospective, regulations are retroactive.  Initially it appears

that the Federal Circuit has barred the reopening of a case under CUE when it is

based on a change in regulation.  *Jordan v. Nicholson* 401 F.3d 1296, 1298 -1299

(Fed. Cir. 2005) (Clear and unmistakable error does not include the otherwise

correct application of a statute or regulation where, subsequent to the Board

decision challenged, there has been a change in the interpretation of the statute or

regulation.").   An exception has been fashioned by the Federal Circuit, however,

when the interpretation of the statute explains what the statute has meant since the date of enactment. *Patrick v. Shinseki*, 668 F.3d 1325, 1329 (Fed. Cir. 2011). In that case, the regulation is retroactive. *Id*.

In the instant case, the regulation does not appear to be new. Instead it is a clarification of the Agent Orange Act and an obvious attempt to explain the meaning of the law as the VA interpreted it.

The Agent Orange Act of 1991 provides that:

... [A] veteran who, during active military, naval, or air service in the Republic of Vietnam during the period beginning on January 9,1962, and ending on May 7,1975, and has ...[Diabetes Mellitus (Type 2)] shall be presumed to have been exposed during such service to an herbicide agent containing dioxin ... unless there is affirmative evidence to establish that the veteran was not exposed to any such agent during service.

38 U.S.C. § 1116(a)(3).

The original version of the M21-1 Manual read as follows:

(1) It may be necessary to determine if a veteran had "service in Vietnam" in connection with claims based on exposure to herbicide agents, See paragraph 5,10c, In the absence of contradictory evidence, "service in Vietnam" will be conceded if the records show that the veteran received the Vietnam Service Medal except if the veteran participated in high altitude flights only, (VAOPGCREC 7-93) Manual M21-1, part III, para, 4.24g, (Change 76, June 1,1999).

Obviously, under this provision, as under the current provision, the veteran would have been afforded the presumption of exposure and would have been

14

eligible for the claimed benefits, as he was awarded the Vietnam Service Medal.
A 187.

   The M21-1MR Manual, and it predecessor, are interpretive rather than
substantive. *Haas v. Peake,* 525 F.3d 1168, 1196 (Fed. Cir. 2008). The *Haas*
Court found as follows:

> [P]ertinent provision of Manual M21–1 is an interpretive statement,
> not a substantive rule. As the DVA has explained, Manual M21–1 "is
> an internal manual used to convey guidance to VA adjudicators. It is
> not intended to establish substantive rules beyond those contained in
> statute and regulation." 72 Fed.Reg. 66,218, 66,219 (Nov. 27, 2007).

*Id*. It is well settled that substantive rules effect a change in existing law or policy
and affect individual rights. On the other hand, interpretive rules "clarify or
explain existing law or regulation. *Paralyzed Veterans of Am. v. West,* 138 F.3d
1434, 1436 (Fed.Cir.1998). An interpretive rule "merely 'represents the agency's
reading of statutes and rules rather than an attempt to make new law or modify
existing law.' " *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans
Affairs,* 260 F.3d 1365, 1375 (Fed.Cir.2001).

   Since the June 2009 provision of the M21-1 manual was an interpretive rule
rather than a substantive one, it is retroactive under the teachings of *Patrick v.
Shinseki*, *supra*. Accordingly, the actions of the BVA in rejecting the June 2009
version were clearly erroneous and the actions of the original February 2009 BVA

were clear and unmistakable error. The court below erred in not finding clear and unmistakable error in this matter in light of the teachings of *Patrick*.

**B.** **The Law Prior to the M21-1MR Manual Required the Presumption to Be Granted for Entry into Da Nang Harbor**

While an incomplete record makes it hard to determine exactly what the law was at the time of the February 2009 BVA decision, a review of BVA decisions at the time is illustrative of what the interpretation must have been.

In docket number 04-00-250, A 68-70, the Board of Veterans Appeals found that entry into Da Nang Harbor was sufficient to have constituted entry into the inland waters of the Republic of Vietnam. The BVA noted that Da Nang harbor was surrounded on three sides by land, A 70, and that this constituted service within the territorial boundaries of Vietnam. *Id*.

This finding complies with the state of the law at the time. Inland waters are defined pursuant to the Convention on the Territorial Sea and Contiguous Zone, [1958] 15 U.S.T. 1607, T.I.A.S. No. 5639. *United States v. Alaska* 521 U.S. 1, 62 (1997) (Thomas, J. et. al. Concurring in part and dissenting in part). Earlier, in *United States v. State of California*, 381 U.S. 139 (1965), the Supreme Court also relied upon the 1958 Convention to define the term "inland waters." *Id* at 161-68.

Article 5, Section 1,of the 1958 Convention defined inland[2] waters as

follows:

> 1. Waters on the landward side of the baseline of the territorial sea
> from part of the internal waters of the State.

Vietnam claims as internal or inland waters the landward side of the baseline.

United States Department of State *Bureau* of *Intelligence and Research, Limits in

the Seas No. 99* Straight Baselines: Vietnam, (1983).

The Secretary has recognized the presumption for those who served onboard

ships who were in "inland" waters.  They have failed to include those who served

in ships extending out to the baseline.  The Secretary has irrationally interpreted

inland waters to include only landward from the mouth of rivers.  This

interpretation does not comport with binding Supreme Court precedent.

Consequently, the law prior to the M21-1MR change required that the veteran be

given the presumption of exposure.

> **C.     The Change in the Law Reflected By the M21-1MR Manual
> Required the Board to Order the Restoration of Benefits
> under *Nehmer*.**

The court below erred in limiting the application of *Nehmer v. U.S. Dept. of

Veterans Affairs*, 712 F. Supp. 1404 (N.D. Cal. 1989) to those cases before the VA

---

[2] The Supreme Court in the decisions cited herein used the definition of
internal waters to specify inland waters.

on May 3, 1989; previously denied between September 25, 1985, and May 3, 1989; or received by VA between May 3, 1989, and May 8, 2001. Opinion at 5-6. Appellant's first claim was made on August 15, 2004. A 94.

The Northern District of California in *Nehmer v. U.S. Veterans' Admin, supra,* found that the VA "imposed an impermissibly demanding test for granting service connection for various diseases *and* refused to give veterans the benefit of the doubt in meeting that demanding standard." *Id* at 1423. This class action suit resulted in the general vacation of VA denials in Agent Orange cases. A consent decree entered into by the VA in this ligation required the readjudication and payment of benefits to previously denied claims upon the change in the law governing service connection. This consent decree was reflected as follows:

> [T]he Stip. & Order requires the VA to reopen and readjudicate previously denied claims that were voided by the Court's May 1989 order if and when the VA issues new Agent Orange regulations service-connecting diseases other than chloracne. Specifically, paragraph 3 of the Stip. & Order provides that:
> - As soon as a final rule is issued service connecting, based on dioxin [Agent Orange], any of [certain specified diseases], and any other disease which may be service connected in the future ... the VA shall promptly thereafter readjudicate all claims for any such disease which were voided by the Court's Order of May 3, 1989 without waiting for final rules to be issued on any other *as well as adjudicate all similar claims filed subsequent to the Court's May 3, 1989 Order* diseases. (Emphasis added).

> Stip. & Order at ¶ 3.

*Nehmer v. U.S. Veterans Admin*. 32 F.Supp.2d 1175, 1177 (N.D.Cal. 1999).

The Secretary then resisted the payment of retroactive benefits based on a change of the law. This was deemed to be a violation of the consent decree. This was rejected by the Ninth Circuit who found as follows:

> We reject VA's attempt to read the stipulation as distinguishing between those claimants who filed for benefits before valid regulations were promulgated, and those who filed after. The plain language and remedial purpose of the consent decree indicate that VA agreed to pay retroactive benefits *to all claimants whose claims were filed after 1989*, if and when the disease from which they suffer is service connected under the Agent Orange Act. Such an agreement not only comports with the language of Paragraphs 3 and 5, it serves the remedial purpose of the consent decree by helping ensure that any delay in the effort to determine Agent Orange's devastating effects, due to VA's issuance and defense of its earlier invalid regulations, shall not be borne by ailing veterans. (Emphasis added).

*Nehmer v. Veterans' Admin. of Government of U.S.,* 284 F.3d 1158, 1161 -1162 (9ᵗʰ Cir. 2002). This action supercedes the May 8, 2001 date cited in the court below. Notably this Court has not specifically required a limiting date to *Nehmer* requirements.

In response to the Ninth Circuit's decision, the VA promulgated their "*Nehmer*" regulations in 2003, amending them in 2008. These regulations were in effect in February of 2009 and again at the time of the BVA's more recent decision. These regulations are contained in 38 C.F.R. § 3.816. While the

19

provision discusses various effective dates, it does not provide a cutoff date for

eligibility or notification.  In the instant case, the veteran is a surviving Vietnam

Veteran within the scope of § 3.816(b)(1)(i) and suffers from Type 2 diabetes as

required by § 3.816(b)(2)(i).

Here the M21-1MR Manual, once adopted in June of 2009, certainly

established a presumption of service connection for a covered disease for those

who tied up to the pier and claimed to have gone ashore.  This version of the M21-

1MR Manual is clear and specific.  It states that the presumption is granted when

the evidence shows the ship:

- docked to the shores in the RVN, or
- operated temporarily on the RVN inland waterways
- evidence places the Veteran aboard the ship at the time the ship docked to the shore or operated on the inland waterways, and
- if the ship docked to the shore, the Veteran states that he/she went ashore after the ship docked.

The record and the BVA Opinion conceded that the *Pickaway* was docked

and the veteran was aboard the ship at the time of docking.  A 79. The veteran has

also stated unequivocally that he went ashore, A 73, although he was confused as

to the date after 40 years.  Here the Veterans Law Judge impermissibly departed

from the Manual and entered upon a frolic of his own.  He apparently has

interpreted this regulation as allowing him to make a judgment call as to whether

the veteran actually went ashore.  The plain language of the regulation belies that
interpretation.

It is well settled that the rules for construing statutes apply equally to
interpreting regulations.  *Smith v. Brown,* 35 F.3d 1516, 1523 (Fed.Cir. 1994).
The words of a statute or regulation are to be given their plain meaning.  *See,*
*Tropf v. Nicholson*, 20 Vet.App. 317, 321 n. 1 (2006).  Here the plain meaning is
clear.  No one disputes the fact that the ship was moored to the pier.  The
articulation by the veteran that he went ashore fulfills the remainder of the
regulatory requirement.

Accordingly, under *Nehmer* and its progeny, the VA was required to seek
out and readjudicate benefits once the M21-1MR changed.  Their failure to do so
was arbitrary and capricious and in contravention of existing law, which resulted
in clear and unmistakable error.

II.	**The Refusal of the VA and the Court Below to Find that the Veteran
	Was Presumptively Exposed to Agent Orange Was Clear and
	Unmistakable Error.**
	A.	***Haas v. Peake* Does Not Control in this Matter**.

Any reliance on *Haas v. Peake*, 525 F.3d 1168 (Fed. Cir. 2008) is misplaced
since the *Haas* court merely questioned the applicability of the 1958 Convention's
interpretation of the definition of territorial seas but did not rule it invalid.  *Haas*,

544 F.3d 1306, 1309 (Fed. Cir. 2008). More importantly, the *Haas* court did not

address Vietnam's own definition of their territorial seas or the United States

recognition of that sovereignty. Nor did the *Haas* Court address the definition of

the Vietnamese sovereignty over the bays and harbors which are at issue in the

instant case. Finally, *Haas* itself recognized that their decision did not apply the

pro-veteran canon of statutory construction.

The latter point is especially important since *Haas* preceded the Supreme

Court action in *Henderson v. Shinseki, supra.* which found that "the canon that

provisions for benefits to members of the Armed Services are to be construed in

the beneficiaries' favor." *Id.* at 1209. Additionally, the Supreme Court has acted

to limit the discretion agencies are given to interpret their regulations.

*Christopher v. Smith Kline Beecham Corp.*, 132 S.Ct. 2156 (2012). In

*Christopher*, the High Court held that:

> Deference is undoubtedly inappropriate, for example, when the agency's
> interpretation is " 'plainly erroneous or inconsistent with the regulation.' "
> *Id.,* at 461, 117 S.Ct. 905 (quoting *Robertson v. Methow Valley Citizens
> Council,* 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). And
> deference is likewise unwarranted when there is reason to suspect that the
> agency's interpretation "does not reflect the agency's fair and considered
> judgment on the matter in question." *Auer, supra,* at 462, 117 S.Ct. 905; see
> also, *e.g., Chase Bank, supra,* at ——, 131 S.Ct. at 881. This might occur
> when the agency's interpretation conflicts with a prior interpretation, see,
> *e.g., Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 515, 114 S.Ct. 2381,
> 129 L.Ed.2d 405 (1994), or when it appears that the interpretation is nothing

more than a "convenient litigating position," *Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), or a " '*post hoc* rationalization[n]' advanced by an agency seeking to defend past agency action against attack,"

*Christopher v. Smith Kline Beecham Corp.,* 132 S. Ct. 2156, 2166, 183 L. Ed. 2d 153 (2012).

Thus *Haas* must be limited to its facts. Notably, the Appellant in *Haas* was later found to have been exposed to Agent Orange. *Haas v. Shinseki*, 22 Vet. App. 385, 389 (2009).

### B. The Failure to Grant Service Connection Based on the Ship's Anchorage in Nha Trang Was Clear and Unmistakable Error.

The record documents conclusively that the veteran, while on board the *Pickaway*, anchored in 12 fathoms (72 feet) of water in Nha Trang Harbor. A 1009-110. The only salient question is whether or not the veteran was exposed to Agent Orange in that harbor.

Notably, service connection can be granted pursuant to 38 U.S.C. § 1113(b). This provision provides that:

> Nothing in section 1112, 1116, 1117, or 1118 of this title, subsection (a) of this section, or section 5 of Public Law 98-542 (38 U.S.C. 1154 note) shall be construed to prevent the granting of service-connection for any disease or disorder otherwise shown by sound judgment to have been incurred in or aggravated by active military, naval, or air service.

> It is well settled that under 38 U.S.C. § 1113(b) a veteran is not precluded

23

from establishing service connection with proof of actual direct causation. *Wynn v. Gober* 17 Vet.App. 460 (Vet.App. 2000). Such evidence is established by satisfactory proof of direct service connection. *See Combee v. Brown,* 34 F.3d 1039 (Fed.Cir.1994). Consequently, the failure of the Veterans Law Judge and the court below to find service connection was clear and unmistakable error.

The Australian Department of Veterans Affairs commissioned a study concerning the relationship of agent orange to cancers, the *Cancer Incidence in Vietnam Veterans 2005* (hereinafter the 2005 Cancer Study). The 2005 Cancer Study found that Royal Australian Navy veterans had the highest rate of cancer, higher than expected by 22-26%, followed by Army veterans, higher than expected by 11-13% and Air Force veterans with a 6-8% higher than the expected rate of cancer. The cancers unique to the Navy would appear to support the ingestion of the dioxin orally rather than nasally.

The Institute of Medicine's Committee on Blue Water Navy Vietnam Veterans and Agent Orange Exposure report published in May of 2011 found that there was a plausible exposure pathway and routes of exposure to Agent Orange to those who served offshore in what is colloquially known as the "Blue Water Navy." *Blue Water Navy Vietnam Veterans and Agent Orange Exposure*, National Academes Press (2011) (hereinafter IOM 2011). This was in consonance with the

2009 Institute of Medicine report of the Seventh Biennial Committee *Veterans and Agent Orange* (hereinafter IOM 2009). The IOM 2009 report found as one of its conclusions, that "members of the Blue Water Navy should not be excluded from the set of Vietnam-era veterans with presumed herbicide exposure."

In addition, the presence of Agent Orange was confirmed in Nha Trang Harbor. *Pavlov, et, al*, *Present-Day State of Coral Reefs of Nha Trang Bay (Southern Vietnam) and Possible Reasons for the Disturbance of Habitats of Scleractinian Corals*, Russian Journal of Marine Biology, Vol. 30, No. 1 (2004). A 37-44. That report studied the effects of Agent Orange on coral in the harbor. Their findings are as follows:

> The results of chromatographic and mass spectrometric analyses revealed the presence of persistent congeners PCDD and PCDF in bottom sediment samples from the bay. The spectrum and distribution pattern of congeners in all samples were close to those of the defoliant "Agent Orange" (predominantly 2,3,7,8-TCDD, 1,2,3,4,6,7,8-HpCCD, OCCD, and 1,2,3,7,8,9-HxCDF, OCDF). The total amounts of dioxins in the bottom sediments at sampling stations varied from 0.409 to 20.806 ng/kg in I-TEQ (Table 2), which is several orders of magnitude higher than the accepted sanitary standards. A 43.

In December 2002, a report by the National Research Centre for Environmental Toxicology in conjunction with the Queensland Health Scientific Services determined that sailors assigned to ships of the Royal Australian Navy were exposed to Agent Orange. National Research Centre for Environmental

Toxicology and the Queensland Health Services, EXAMINATION OF THE POTENTIAL EXPOSURE OF ROYAL AUSTRALIAN NAVY (RAN) PERSONNEL TO POLYCHLORINATED DIBENZODIOXINS AND POLYCHLORINATED DIBENZOFURANS VIA DRINKING WATER, Brisbane Queensland, Australia (2002) (hereinafter RAN Report). The study noted that ships in the near shore marine waters collected water that were contaminated with the runoff from areas sprayed with Agent Orange. RAN Report at 10. The distilling plants aboard the ship, which converted the salt water into potable drinking water, according to the study, actually enhanced the effect of the Agent Orange. RAN Report at 7. *See also*, A 46-51.

The *Pickaway* is a steam ship and converted salt water to drinking water via onboard distilling plants (also known as evaporators). While efforts were made to reduce potable water distillation in port that was not always possible - especially if the ship was anchored in the near shore waters for long periods providing support. The IOM 2011 report found that prohibitions or guidelines on the distilling of potable water near the mouth of rivers were widely ignored. Additionally, since the same distillation system was used for boiler water as for potable water, the internals of the system would be contaminated with Agent Orange even if the ship did not distill to potable water while anchored. A 50.

In the shipboard distilling process used on steam ships of all nations at the time, water is injected from the sea and is passed through the distilling condenser and air ejector condenser where it acts as a coolant for the condensers. It is then sent through the vapor feed heater into the first effect chamber and into the second effect chamber where it is changed to water vapor. Vapor then is passed through a drain regulator into a flash chamber and passes through baffles and separators into the distilling condenser where it is condensed into water and pumped to the ship's water distribution system. Sea water not vaporized is pumped over the side by the brine pump. This is the same type of process discussed in the RAN report. In fact many Royal Australian Navy ships were obtained from the United States Navy.

The Australian study confirmed the enhancing effects of the shipboard distilling plants. In other words, the effect was even more pronounced than if the veteran had merely ingested Agent Orange by breathing it or by drinking water from a contaminated stream. The IOM 2011 report replicated and validated the Australian study and found that the dioxin was enriched by a factor of ten during the distilling process.

Nha Trang Harbor was a busy harbor with Navy and merchant ships constantly entering and departing. The Agent Orange which the Russians found adhering to the bottom sediment and the coral would have been disturbed by the

27

frequent entrances and sorties as well as by the constant anchoring and weighing anchor.  The bottom sediment in this shallow water area would have been constantly churned up causing the Agent Orange to rise to the surface where it would be taken into the distilling plant suction.

Mr. McKinney proved that the Agent Orange was in the harbor.  As confirmed by the University of Queensland and the IOM, the distillation plant would have co-distilled the Agent Orange causing it to contaminate the water supply.  Hydration is important in the tropics and Mr. McKinney would have ingested a significant amount of water from the ship's tanks.  Additionally he would have showered in it.  His clothes would have been washed in it.  This water would also have been used to prepare his food.  Without question, Mr. McKinney was directly exposed to Agent Orange, while in Nha Trang harbor.

**C.      The Failure to Find that Service in Territorial Seas Constitutes
Service in the Republic of Vietnam Was Clear and Unmistakable
Error.**

The  deck logs of the *Pickaway* and the BVA Opinion clearly show that the ship was within the territorial waters of Vietnam.  This included the Nha Trang area, which as discussed *supra* was heavily contaminated by Agent Orange and anchorages in Da Nang harbor, which is surrounded on three sides by land.  *See*, Nguyen Hung Minh *et. al.*, *Comprehensive Assessment of Dioxin Contamination*

*in Da Nang Airbase and Its Vicinities: Environmental Levels, Human Exposure and Options for Mitigating Impacts*, <u>Terrapub</u>, 2009, p. 23. Fig. 1. Depth of water in Da Nang was 27-42 feet, which would have resulted in the disturbance of the Agent Orange adhering to the sea bed by repeated anchoring and weighing anchor. (IOM 2011 report). *Id.* Da Nang Harbor was also the site of significant Agent Orange infiltration. *See*, J.P. Rossie et. al., The Da Nang Harbor Report, <u>www.BlueWaterNavy.org</u> (2010). The ship also anchored at Vung Tau and Cam Ranh Bay.

Vietnam claims a 12 mile territorial sea. *See* <u>Straight Baselines: Vietnam</u> *supra*. That is consistent with the limitations of the United Nations Convention on the law of the Sea Article 3 and the 1958 Convention. The court below, however, rejected the reasoning, because the Appellant had apparently not adequately explained why the law of the sea, as it applies to Vietnam, should bind the VA.

Initially, it is not the place of the VA to define the sovereign territory of a nation. A nation defines its own sovereignty and the United States at its discretion can recognize it or not. Without question, the United States recognized the Republic of Vietnam and its sovereignty. The issue here is the limits of the United States' recognition of the sovereignty of the Republic of Vietnam. An understanding of the Vietnam territory only begins to reveal the unreasonable

29

determination by the VA.

Since its founding, the Republic of Vietnam claimed sovereignty over territorial seas and the bays as well as other inland waters. Article 4 of the Agreement on the Cessation of Hostilities in Vietnam, (hereinafter 1954 Geneva Accords) issued July 20, 1954 provides:

> The provisional military demarcation line between the two final regrouping zones is extended into the territorial waters by a line perpendicular to the general line of the coast. All coastal islands north of this boundary shall be evacuated by the armed forces of the French union, and all islands south of it shall be evacuated by the forces of the People's Army of Viet-Nam.

Geneva Accords Article 4. https://www.mtholyoke.edu/acad/intrel/genevacc.htm (last visited June 6, 2014). Article 24 of the 1954 Geneva Accords Confirms the sovereignty of the territorial seas:

> The present Agreement shall apply to all the armed forces of either party. The armed forces of each party shall respect the demilitarized zone and the territory under the military control of the other party, and shall commit no act and undertake no operation against the other party and shall not engage in blockade of any kind in Viet-Nam.
>
> For the purposes of the present Article, the word "territory" includes territorial waters and air space.

*Id*. Accordingly, the founding document of the Republic of Vietnam recognizes its sovereignty over the territorial seas.

The next question that must be answered is whether the United States

30

recognized the territorial seas, Vietnamese sovereignty over those seas and the

breadth of the territorial seas.  Initially, as documented in the history of the Joint

Chiefs of Staff, the United States recognized a three mile sovereign territorial seas:

> The Saigon government would announce that it had asked the United
> States for help in countering sea infiltration.  It would further declare
> its territorial waters up to the three-mile limit a "Defensive Sea Area"
> in which it would, with US help, stop and search any vessel of any
> nation suspected of supporting the Viet Cong.

*The Joint Chiefs of Staff and the War in Vietnam 1960-1968,* Part II at page 256

http://www.dtic.mil/doctrine/doctrine/history/jcsvietnam_pt2.pdf.

The Secretary of Defense, acting on behalf of the President, later expanded

the United States recognition of the sovereign territorial seas to twelve miles.

> Whereas the earlier rules had established a three-mile limit for
> territorial waters, the Secretary changed this limit to 12 miles. He
> appreciated the Joint Chiefs' "concern over the apparent recognition
> of a twelve-mile territorial limit but, solely for the purpose of these
> rules," he believed it was "not desirable" to "bring these claims to
> issue with State now.

*Id.* at 358.  The unilateral action of the Secretary of Defense recognized the 12

mile limit for the territorial seas of the Republic of Vietnam.

The matter was formally ratified by the United States in the Agreement On

Ending The War And Restoring Peace In Viet-Nam, executed and entered into

force on January 27, 1973.

http://www.upa.pdx.edu/IMS/currentprojects/TAHv3/Content/PDFs/Paris_Peace_

Accord_1973.pdf (last visited June 6, 2014).  Article 1 of that agreement provides

that:

> The United States and all other countries respect the independence,
> sovereignty, unity, and territorial integrity of Viet-Nam as recognized by the
> 1954 Geneva Agreements on Viet-Nam.

*Id.*  In other words, the United States formally recognized the sovereignty of the

territorial seas of both the Republic of Vietnam and the Democratic Republic of

Vietnam.   The Secretary cannot now claim that his interpretation supersedes the

formal declaration of the Republic of Vietnam or United States recognition of that

declaration of sovereignty.  To the extent that the Secretary maintains this position

– it is irrational.

   As discussed *supra*., any reliance on *Haas* is misplaced since the *Haas* court

did not rule that the territorial seas or the bays an harbors were not part of the

sobering territory of Vietnam.  In fact, the question of the bays and harbors was

not addressed in *Haas*.  Nor were the 1954 Geneva Accords or their explicit

recognition in the Paris Peace Accord.

   The Supreme Court has also adopted the international definitions of bays

and harbors.  In *Louisiana v. Mississippi,* 202 U.S. 1, 52 (1906), the Supreme

Court held that the Mississippi Sound, and by analogy, the waters surrounding Da

Nang as internal waters, were under the category of "bays wholly within [the Nation's] territory not exceeding two marine leagues in width at the mouth." Inland, or internal waters are subject to the complete sovereignty of the nation, as much as if they were a part of its land territory. *United States v. Louisiana*, 394 U.S. 11 (1969). Subject to the right of innocent passage, the coastal state, in this case Vietnam, has the same sovereignty over its territorial sea as it has with respect to its land territory. *See*, 1958 Convention, *supra*, Article 1-2; Law of the Seas Convention, Article 2. Thus any time the *Pickaway* was within twelve miles of the baseline, they would have had to have been within the internal waters or territorial seas of Vietnam. As discussed *infra*, when at anchor at Nha Trang, or at anchor or moored in Da Nang it was within the sovereign territory of Vietnam. At all relevant times, the ship was within the sovereignty of Vietnam and therefore its crew "served in the Republic of Vietnam." The closer a ship was to shore, the higher the possibility that they steamed through waters contaminated with Agent Orange. As discussed *supra*., anchoring in those waters would have disturbed any Agent Orange contaminated sludge that had fallen to the seabed.

This Court does not have to define the outer limits of the territorial seas or measure the exact latitude and longitude of the national sovereignly of the Republic of Vietnam. The record clearly shows that the *Pickaway* anchored in Da

Nang, Vung Tau and Nha Trang harbors as well as Cam Ranh Bay. Bays and harbors have been found to constitute sovereign territory.

In *Boumediene v. Bush* 553 U.S. 723, 832, 128 S.Ct. 2229, 2296 (2008), the Supreme Court of the United States noted that Guantanamo Bay was located within the sovereign territory of Cuba. This is based on Article 7 of the 1958 Convention which the Supreme Court relies upon in coastal disputes. *United States. v. Maine* 475 U.S. 89, 94, 106 S.Ct. 951, 954 (1986). The Supreme Court has noted that the 1958 Convention contains "the best and most workable definitions available." *United States v. California, supra.,* 381 U.S. at 165, 85 S.Ct. at 1415).

The definition of a bay in the 1958 Convention was again adopted by the Supreme Court as follows.

> Article 7(2) of the Convention sets forth the following geographic criteria for deciding whether a body of water qualifies as a bay:
>
> "For the purposes of these articles, a bay is a well-marked indentation whose penetration is in such proportion to the width of its mouth as to contain landlocked waters and constitute more than a mere curvature of the coast. An indentation shall not, however, be regarded as a bay unless its area is as large as, or larger than, that of the semi-circle whose diameter is a line drawn across the mouth of that indentation." 15 U.S.T., at 1609.

*Alaska v. United States.* 545 U.S. 75, 93, 125 S.Ct. 2137, 2151 - 2152 (2005).

Da Nang and Nha Trang Harbors certainly meet this legal requirement.

34

Without question, these areas constitute bays under the 1958 Convention. There can be no argument that these bays are part of the sovereign territory of the nation and well within the scope of Article 1 of the 1958 Convention. Consequently, under both national and international law, McKinney served in the Republic of Vietnam and should be afforded the presumption.

**III.** **The Instant Case Meets the Criteria for Clear and Unmistakable Error Because the Veterans Law Judge Required the veteran to Show a Ship's Log Entry When He Proceeded Ashore When No Such Entry was Required**.

The court below argued that Appellant's arguments concerning the deck logs is a mere disagreement on how the facts were weighed or evaluated. This is not the case. The BVA's determination that Appellant did not go ashore because there was no deck log entry is clear and unmistakable error.

The Veterans Law Judge claimed "lack of corroborating evidence" because there was no entry in the deck log to justify his decision A 79-80. Here the Veterans Law Judge complained that the Deck Log did not show that any of the crew went ashore. The Veterans Law Judge should have been familiar with OPNAVINST 3100.7 series which does not require such entries. Only the departure and return of the Commanding Officer, unauthorized absentees or the transfer/receipt of personnel is required. A 30-36.

As a practical matter, it would be impossible to document every person who left the ship. Sailors leave the ship for working parties for supplies, to inspect mooring lines, shore power connections and water hoses. Portable damage control equipment is often tested on the pier. Pier sentries are deployed for protection. Sailors connect and disconnect fuel oil and lubricating oil hoses. Others take draft readings and visually inspect the hull and overboard discharges. A 52. In the case of an APA, troops and cargo are offloaded, often using small boats. The fact that the ship was actually brought alongside the pier was strong evidence that cargo was offloaded since it is easier to do that pier side than at anchorage. Cargo offloads would have required a working party made up of non-rated personnel such as the veteran. Additionally, as a member of the Deck Department, Mr. McKinney would have been assigned to the boats and his statement that he rode personnel boats into the shore is most plausible. In short, the type of ship and the veteran's position on it provide the corroborating evidence that the Veterans Law Judge desired.

Consequently it was clear and unmistakable error to have required a deck log entry.

## Conclusion

For the reasons delineated herein, the decision of the Court of Appeals for

Veterans Claims should be reversed and remanded for further proceedings

consistent with the ruling of this Court.

<div style="margin-left: 50%;">

Respectfully Submitted,
/s/ John B. Wells
John B. Wells
LA bar #23970
P. O. Box 5235
Slidell, LA 70469-5235 (mail)
769 Robert Blvd., Ste 201D
Slidell, LA 70458 (physical)
985-641-1855
985-649-1536 (fax)
JohnLawEsq@msn.com

</div>

## CERTIFICATE OF SERVICE

I certify a copy of the foregoing pleading has been served upon the Clerk of

Court counsel for all parties this 18th day of August 2014 via the court's EC/CMF

system.

<div style="margin-left: 50%;">

/s/ John B. Wells
John B. Wells

</div>

## CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,524 words by computer word count, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a monospaced typeface using Wordperfect 8.0 with 14-point proportionally spaced face.

/s/ John B. Wells
John B. Wells

# ADDENDUM

Memo opinion

Panel opinion

Final Judgment

*Designated for electronic publication only*

# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 12-2790

JAMES S. MCKINNEY, APPELLANT,

V.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

Before PIETSCH, *Judge*.

## MEMORANDUM DECISION

*Note: Pursuant to U.S. Vet. App. R. 30(a),
this action may not be cited as precedent.*

PIETSCH, *Judge*: James S. McKinney appeals through counsel a June 8, 2012, Board of Veterans' Appeals (Board) decision that determined that a February 17, 2009, Board decision that denied entitlement to VA benefits for diabetes mellitus, type 2, to include as a result of exposure to herbicides, did not contain clear and unmistakable error. On August 4, 2013, Mr. McKinney filed a motion for oral argument, which the Secretary opposed. Because oral argument would not materially assist the Court in the disposition of this appeal, the motion for oral argument is denied. *See Janssen v. Principi*, 15 Vet.App. 370, 379 (2001); *see also* U.S. Vet. App. R. 34(b) ("Oral argument normally is not granted on . . . matters being decided by a single Judge."). This appeal is timely and the Court has jurisdiction to review the Board's decision pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). Single-judge disposition is appropriate as the issue is of "relative simplicity" and "the outcome is not reasonably debatable." *Frankel v. Derwinski*, 1 Vet.App. 23, 25-26 (1990). For the reasons that follow, the Court will affirm the Board's June 8, 2012, decision.

## I. FACTS

Mr. McKinney served on active duty in the U.S. Navy from July 1966 to April 1970, for which he received the Vietnam Service Medal. Record (R.) at 320. His service included time

onboard the USS *Pickaway* from October 1966 to February 1968. R. at 219. The USS *Pickaway* was deployed in the waters off the coast of Vietnam. R. at 548-49.

In August 2004, Mr. McKinney sought VA benefits for diabetes mellitus claimed to be the result of exposure to Agent Orange during service. R. at 637-646. In March 2005, a VA regional office (RO) denied his claim, finding that there was no evidence that Mr. McKinney set foot in Vietnam or was actually exposed to herbicides during service. R. at 516. Mr. McKinney filed a Notice of Disagreement (NOD) with that decision, and VA issued a Statement of the Case (SOC) continuing its denial. R. at 505-11, 455-73. Mr. McKinney appealed to the Board, arguing that his duties aboard the USS *Pickaway* included escorting "small crafts back and forth [from] the shores of Vietnam" and that he "did enter Vietnam performing collateral duties." R. at 448. He also asserted that he would leave the USS *Pickaway* and serve on small boats and on land. R. at 437.

VA subsequently sought and received deck logs for the USS *Pickaway* during the time that Mr. McKinney served onboard. R. at 362-402. The deck logs reflect that the commander of the ship, Captain Gonzales, departed the ship. R. at 362-401.

In October 2006, VA issued a Supplemental SOC, continuing to deny Mr. McKinney's claim. R. at 271-274. At a January 2008 hearing before the Board, Mr. McKinney testified that he traveled from the USS *Pickaway* to the shore in Vietnam, where he unloaded supplies. R. at 236-37. In February 2009, the Board denied Mr. McKinney's claim, finding that the evidence did not show that he set foot in Vietnam and that his diabetes mellitus was not otherwise related to his military service. R. at 217-228. The Board rejected Mr. McKinney's statements that he went ashore, finding those statements not credible. R. at 225. In doing so, the Board noted that Mr. McKinney's statements regarding going ashore had varied over the years and that the ship's deck logs contradicted his statements. R. at 227. Mr. McKinney did not appeal this decision, and it became final.

In March 2010, Mr. McKinney sought to reopen his claim based on the submission of new and material evidence. R. at 199-204. However, in June 2010, the RO determined that new and material evidence had not been submitted to reopen his claim. R. at 842-848.

In May 2011, Mr. McKinney filed a motion for revision of the February 2009 Board decision on the basis of clear and unmistakable error. R. at 63-74. In support of his motion, he asserted that the Board failed to apply the proper provisions of the VA Adjudication Procedures Manual

(Manual), arguing that his statement that he went ashore is sufficient to warrant entitlement to presumptive exposure to herbicides.  R. at 66.

On June 8, 2012, the Board issued the decision on appeal, finding that the February 2009 decision did not contain clear and unmistakable error and denying Mr. McKinney's motion for revision.  R. at 3-10.  The Board noted that, although Mr. McKinney argued that the Board failed to properly apply provisions in the Manual, the provisions to which he refers were not in effect at the time of the Board's February 2009 decision.  The Board found that service in the Republic of Vietnam only included service on land or in the country's inland waterways and, therefore, the Board in February 2009 did not commit clear and unmistakable error in finding that Mr. McKinney's service in other territorial waters did not constitute service in Vietnam.

On appeal, Mr. McKinney argues that the Board erred in finding that the February 2009 Board decision did not contain clear and unmistakable error because it should have retroactively applied the provisions in the Manual to his claim.  Applying these provisions, he contends, would entitle him to the presumption of exposure to herbicides.  He also argues that the Board failed to address his arguments concerning direct exposure, as well as his arguments that service in the bays and harbors of Vietnam constitute service in the Republic of Vietnam.

In response, the Secretary contends that the Board properly found that the February 2009 Board decision did not contain clear and unmistakable error.  The Secretary notes that an allegation of clear and unmistakable error is based on the law as it existed at the time of the decision under review and that, because the changes to the Manual were not in effect at the time of the February 2009 decision, those changes do not apply.  The Secretary further contends that the Board properly applied the law in effect at the time and that Mr. McKinney's arguments improperly seek plenary review of the February 2009 decision.

## II. ANALYSIS

A prior final RO or Board decision must be reversed or revised where evidence establishes clear and unmistakable error (CUE).  38 U.S.C. §§ 5109A, 7111; 38 C.F.R. §§ 3.105(a)(2013), 20.1400-20.1411 (2013).  To establish CUE, a clamant must show that either (1) the facts as they were known at the time were not before the adjudicator, or (2) the statutory or regulatory provisions

extant at the time were incorrectly applied. *See Damrel v. Brown*, 6 Vet.App. 242, 245 (1994). Second, the alleged error must be "undebatable," not merely "a disagreement as to how the facts were weighed or evaluated." *Russell v. Principi*, 3 Vet.App. 310, 313-14 (1992) (en banc). Finally, the error must have "manifestly changed the outcome" of the decision being attacked on the basis of CUE when the decision was rendered. *Id.* at 313-14, 320; *see Bustos v. West*, 179 F.3d 1378, 1380-81 (Fed. Cir. 1999). A mere disagreement with how the facts were weighed or evaluated is not enough to substantiate a CUE motion. *Damrel*, 6 Vet.App. at 245. Final VA decisions are entitled to a presumption of validity and a claimant asserting CUE bears the burden of proving that the subject VA decision was based on CUE. *Pierce v. Principi*, 240 F.3d 1348, 1355 (Fed. Cir. 2001).

When the Court reviews a Board determination that there was no CUE in a prior final Board decision, the Court's review is limited to determining whether the Board's conclusion is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 38 U.S.C. § 7261(a)(3)(A). However, the Court reviews de novo whether the appellant has presented a valid CUE allegation. *Acciola v. Peake*, 22 Vet.App. 320, 324 (2008); *Phillips v. Brown*, 10 Vet.App. 25, 30 (1997); *see also* 38 U.S.C. § 7261(a). The Board must support its decision with an adequate statement of reasons or bases. 38 U.S.C. § 7104(d)(1), *Allday v. Brown*, 7 Vet.App. 517, 527 (1995); *Gilbert v. Derwinski*, 1 Vet.App. 49, 56-57 (1990).

A. Retroactive Application of 2009 Changes to the Manual

Mr. McKinney argues that the Board in 2012 erred in failing to apply provisions in the Manual, which became effective in July 2009, to the February 2009 Board decision when considering whether that decision contained CUE. In support of his argument for retroactive application, he asserts that (1) 38 C.F.R. § 20.1403 governing what constitutes CUE was not authorized by Congress and is *ultra vires*; (2) the effective date of the changes to the Manual are not clear and that, by looking at change lists, transmittal sheets, and amendments to the Manual to determine the effective date of the change, the Board based its decision on information outside of the record; (3) the paternalistic nature of the VA system warrants a retroactive application of the provision; (4) VA failed to assist him in developing his claim; and (5) he meets the requirements of being a *Nehmer* class member and, as such, the changes to the Manual should have been applied retroactively to his claim. He argues that, under the July 2009 version of the Manual, the Board was

4

required to accept his statement that he went ashore and was not permitted to reject his contention based on a lack of corroborating evidence.

Although Mr. McKinney makes several arguments regarding why the Court should retroactively apply the July 2009 amendments to the Manual to the February 2009 Board decision, it is well settled that a determination of CUE must be based upon the record and the law that existed at the time of the prior adjudication in question. *See Willsey v. Peake*, 535 F.3d 1368, 1371 (Fed. Cir. 2008); *see also May v. Nicholson*, 19 Vet.App. 310, 313 (2005) (stating that a determination of CUE must be based upon the record and the law that existed at the time of the prior adjudication in question). The Board determined that the changes to the Manual were not in effect at the time that the Board issued its February 2009 decision and, thus, could not be a basis for an allegation of CUE. Mr. McKinney has failed to establish that the Board's determination is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 38 U.S.C. § 7261(a)(3)(A).

Even assuming that the changes to the Manual simply clarified the existing law regarding the presumption of exposure to herbicides, Mr. McKinney has not shown that the application of the new version would have "manifestly changed the outcome" of the decision. *Russell,* 3 Vet.App. at 313-14. To establish entitlement to a presumption of exposure to herbicides in Vietnam, a veteran must demonstrate service in the Republic of Vietnam. *Haas v. Peake*, 525 F.3d 1168, 1197 (Fed. Cir. 2008) (upholding VA's statutory interpretation excluding the "blue water" Navy from presumptive herbicide exposure).

The amended version of the VA Adjudication Procedures Manual (M21-1MR), pt. IV, subpt. ii, ch. 2, § C.10.k, notes that "[s]ervice aboard a ship that anchored in an open deep-water harbor, such as Da Nang, Vung Tau, or Cam Ranh Bay, along the [Vietnamese] coast does not constitute inland waterway service or qualify as docking to the shore and is not sufficient to establish presumptive exposure to herbicides." That provision further provides that a veteran who served on a Navy ship operating in the offshore waters could establish exposure to herbicides on a presumptive basis by showing evidence that the ship on which he or she was serving docked at the shore and by providing a statement that he or she went ashore after the ship docked. *Id.*; *see also Haas*, 525 F.3d at 1195, 1197.

In its February 2009 decision, the Board considered Mr. McKinney's statements that he went ashore, but found those statements not credible. This credibility determination was a factual finding made by the Board at that time. Although Mr. McKinney provides multiple arguments attacking this finding, including arguments about the Board's reliance on deck logs, a mere disagreement with how the facts were weighed or evaluated is not enough to substantiate a CUE motion. *Damrel*, 6 Vet.App. at 245. Further, although he states that the Board was not permitted to assess the credibility of his statements, he provides no support for that assertion. *See Hilkert v. West*, 12 Vet.App. 145, 151 (1999) (en banc) (holding that the appellant bears the burden of demonstrating error on appeal), *aff'd per curiam*, 232 F.3d 908 (Fed. Cir. 2000) (table).

To the extent that Mr. McKinney argues that the Board in June 2012 relied on evidence outside of the record in reaching its determination regarding the effective date of the changes to the Manual, the Court finds his argument without merit. The Board noted that it reviewed change lists, transmittal sheets, and the amendments to the Manual. The Court does not discern how the Board's reliance on the effective date, as stated in the Manual itself, was in error or somehow prejudiced Mr. McKinney. *See Hilkert*, 12 Vet.App. at 151.

The Court notes that Mr. McKinney appears to make additional arguments concerning the duty to assist. It is not clear from his argument how he is asserting VA violated its duty to assist. Therefore, the Court will not consider that argument further, except to note that a violation of the duty to assist normally cannot constitute CUE. *See Locklear v. Nicholson*, 20 Vet.App. 410, 416-17 (2006) (terse or undeveloped argument does not warrant detailed analysis by Court and is considered waived); *see also Cook v. Principi*, 318 F.3d 1334, 1344 (Fed. Cir. 2002) (en banc); *Caffrey v. Brown*, 6 Vet.App. 377, 382 (1994). Similarly, Mr. McKinney repeatedly refers to VA's paternalistic benefits process. The Court acknowledges that VA should act in a veteran-friendly manner in assisting veterans through the non-adversarial portion of the claims process; however, Mr. McKinney has not shown how any failure by VA to act in a veteran-friendly way constituted CUE in this case. *See Damrel*, 6 Vet.App. at 245.

To the extent that Mr. McKinney argues that he is entitled to VA benefits as a *Nehmer* class member, the Court disagrees. The decision in *Nehmer v. U.S. Dept. of Veterans Affairs* impacted the effective date for an award of benefits and applies to claimants whose claims were pending before

VA on May 3, 1989; previously denied between September 25, 1985, and May 3, 1989; or received by VA between May 3, 1989, and May 8, 2001. *Nehmer v. U.S. Dept. of Veterans Affairs*, 712 F. Supp. 1404 (N.D. Cal. 1989); *see* 38 C.F.R. § 3.816(b) (2013) (defining effective dates for Vietnam veterans with a "covered herbicide disease" in accordance with the holding of *Nehmer*). Mr. McKinney does not assert, and the Court does not find, that his claim meets these criteria.

## B. Provisions in Effect in February 2009

Mr. McKinney also argues that application of the version of the Manual in effect in February 2009 entitles him to benefits. Specifically, he states that his receipt of a Vietnam Service Medal is sufficient to entitle him to the presumption of exposure to herbicides. However, as noted above, evidence of service in the Republic of Vietnam is, and was at the time of the February 2009 decision, also required. *See Haas*, 525 F.3d at 1197. The Board in June 2012 determined that the February 2009 Board decision that Mr. McKinney did not set foot in Vietnam did not contain clear and unmistakable error. Although Mr. McKinney disagrees with that finding, he has not demonstrated that the June 2012 Board decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 38 U.S.C. § 7261(a)(3)(A); *see Damrel*, 6 Vet.App. at 245 (disagreement with how the facts were weighed is not enough to substantiate a CUE motion).

## C. Inland Waterways

Mr. McKinney also argues that the presumption for exposure to herbicides should have been granted for entry into Da Nang Harbor. He argues that Da Nang Harbor constitutes internal or inland waters as defined by the Convention on the Territorial Sea and Contiguous Zone of 1958, 15 U.S.T. 1607, T.I.A.S. No. 5639. Under that treaty, waters on the landward side of the baseline of the territorial sea form part of the internal waters of the state. Mr. McKinney argues that this definition is binding on VA because it was referred to in a decision of the United States Supreme Court. *See United States v. Alaska*, 521 U.S. 1, 62 (1997). In support of his argument, he also cites to a Board decision pertaining to a different veteran, an incomplete copy of which is contained in the record of proceedings before the Court. He further argues that Congress, through the Comprehensive Response Compensation and Liability Act (CERCLA) and the Clean Water Act, has recognized that pollutants from the shore can contaminate waters of the contiguous zones.

Initially, the Court notes that Board decisions are not precedential. *See Hillyard v. Derwinski*, 1 Vet.App. 349, 351 (1991). Next, although Mr. McKinney contends that the Secretary's interpretation of inland waterways does not comport with the law, he does not explain why VA should be bound by the Convention on the Territorial Sea and Contiguous Zone of 1958, CERCLA, or the Clean Water Act. *See Hilkert*, 12 Vet.App. at 151; *see also Locklear*, 20 Vet.App. at 416.

Finally, Mr. McKinney makes additional arguments, including that he was actually exposed to Agent Orange while serving in Nha Trang Harbor through his ship's drinking water and boiler water. In making these arguments, Mr. McKinney does not argue that the June 2012 Board decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 38 U.S.C. § 7261(a)(3)(A), but instead appears to be asking the Court to review the merits of the February 2009 Board decision denying him benefits. However, the Court "cannot conduct a plenary review of the merits of the original decision." *Archer v. Principi*, 3 Vet.App. 433, 437 (1992). As noted above, the Court is limited to determining whether the June 2012 Board determination that the February 2009 Board decision did not contain clear and unmistakable error was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 38 U.S.C. §§ 7261(a)(3)(A), 7104(d)(1); *see Lane v. Principi*, 16 Vet. App. 78, 83-84 (2002), *aff'd*, 339 F.3d 1331 (Fed. Cir. 2003) (affirming this Court's longstanding precedents regarding standard of review in CUE determinations).

## III. CONCLUSION

Upon consideration of the foregoing analysis, the record of proceedings before the Court, and the parties' pleadings, the June 8, 2012, Board decision is AFFIRMED.

DATED: February 20, 2014

Copies to:

John B. Wells, Esq.

VA General Counsel (027)

*Designated for electronic publication only*
*NON-PRECEDENTIAL*

## UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 12-2790

James S. McKinney, Sr.,                    Appellant,

v.

Eric K. Shinseki,
Secretary of Veterans Affairs,             Appellee.

Before DAVIS, and SCHOELEN and PIETSCH, *Judges.*

### O R D E R

*Note:  Pursuant to U.S. Vet. App. R. 30(a),*
*this action may not be cited as precedent.*

On February 20, 2014, the Court affirmed the June 8, 2012, the Board of Veterans' Appeals (Board) decision that determined that a February 17, 2009, Board decision that denied entitlement to VA benefits for diabetes mellitus, type 2, to include as a result of exposure to herbicides, did not contain clear and unmistakable error.  On March 14, 2014, the appellant filed a motion for panel decision pursuant to Rule 35 of the Court's Rules of Practice and Procedure.  The motion for decision by a panel will be granted.

Based on review of the pleadings and the record on appeal, it is the decision of the panel that the appellant fails to demonstrate that 1) the single-judge memorandum overlooked or misunderstood a fact or point of law prejudicial to the outcome of the appeal, 2) there is any conflict with precedential decisions of the Court, or 3) the appeal otherwise raises an issue warranting a precedential decision.  U.S. Vet. App. R. 35(e); *see also Frankel v. Derwinski,* 1 Vet.App. 23, 25-26 (1990).

Upon consideration of the foregoing, it is

ORDERED, by the panel, that the motion for panel decision is granted.  It is further

ORDERED, by the panel, that the single-judge memorandum decision remains the decision of the Court.

DATED: April 28, 2014                    PER CURIAM.

Copies to:

John B. Wells, Esq.

VA General Counsel (027)

*Not Published*

**UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS**

NO: 12-2790

JAMES S. MCKINNEY, APPELLANT,

V.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

**JUDGMENT**

The Court has issued a decision in this case, and has acted on a motion under Rule 35 of the Court's Rules of Practice and Procedure.

Under Rule 36, judgment is entered and effective this date.

Dated: May 21, 2014

FOR THE COURT:

GREGORY O. BLOCK
Clerk of the Court

By: /s/ Willette Cash
Deputy Clerk

Copies to:

John B. Wells, Esq.

VA General Counsel (027)